# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

**JERILYN A. LUCAS,**

                        Plaintiff**,**

                                            **Case No. 05-C-888**

        -vs-

**PYRAMAX BANK, FSB,**

                        Defendant.

---

# DECISION AND ORDER

---

The plaintiff, Jerilyn Lucas ("Lucas"), was hired by PyraMax Bank ("PyraMax") in March of 2003. She was hired as a Bank Executive Officer ("BEO"), but was later transferred to a different position and eventually terminated in December 2004. Lucas alleges that she was demoted and terminated because of her gender and in retaliation for filing a complaint of discrimination in violation of Title VII. Lucas also alleges that she was terminated because of the health care costs associated with her multiple illnesses and a possible future pregnancy in violation of ERISA. Finally, Lucas alleges that she was terminated because she was on intermittent leave in violation of the Family Medical Leave Act ("FMLA").

PyraMax has moved for summary judgment. For the reasons that follow, PyraMax's motion is granted, and this matter is dismissed in its entirety.

# BACKGROUND

## I.     Application/Interview Process

Lucas applied for the BEO position at PyraMax's Greenfield office in February, 2003. At the time of her application, Lucas was employed by ALLCO Credit Union as Manager of Loan Operations and Business Development. Lucas had at least 14 years experience in the areas of consumer lending, collections, marketing and sales, risk management, and human resources.

Monica Baker ("Baker"), Senior Vice President of Human Resources, reviewed applications and interviewed candidates. After selecting three candidates for interview, Baker forwarded those candidates to Karen Murphy ("Murphy"), Senior Vice President-Retail Banking, who supervised all of PyraMax's BEOs. Lucas was one of the three candidates.

Murphy ranked Lucas as the least desired candidate of the three. Lucas' past experience focused on consumer lending, supervising and collections in a credit union environment. However, she had not been responsible for operational functions of a lending institution, including servicing of customers, policy and procedure implementation, coaching, team management, communication, performance management and salary administration. Nonetheless, Lucas was hired after the other two candidates dropped out of the application process. She was offered $50,000.00 a year, a full package of benefits, and quarterly incentives.

-2-

## II.    BEO Greenfield – March 2003

One of Lucas' functions as BEO was that of a sales manager – that is, a seller of the bank's products and a motivator and trainer of the staff in effective sales practices and customer service. Each branch had an Assistant Manager who was responsible for handling "day to day operations" and for managing the tellers (also known as "customer service representatives" or "CSRs"). However, Lucas was also required to supervise branch staff in all aspects of bank operations and to ensure quality of service to bank customers.

Lucas began work as the Greenfield BEO on March 10, 2003, working under Murphy's direct supervision. Lucas underwent PyraMax's orientation training from March 10-14, 2003.

When Lucas began, she did not appear to have any performance problems. However, Lucas required an extraordinary amount of supervision from Murphy and asked for a disproportionate amount of Murphy's time in discussing bank matters that she should have been able to handle without Murphy's involvement, as well as an extraordinary amount of reassurance and praise as compared to all of Murphy's other BEOs.

On March 18, 2003, Lucas met with Murphy for a discussion of personnel issues Lucas inherited at the Greenfield branch. Murphy said that Greenfield's CSRs were as a whole "immature" and that Lucas would have her "hands full" regrouping the staff due to the "country club atmosphere" the prior BEO had left for Lucas.

At the meeting, Murphy also described PyraMax's "flex-time" policy and said that, as long as the bank had coverage by some member of management, Murphy was fine with employees flexing their schedules to balance family and work obligations.

During the same meeting, Murphy and Lucas also shared information about their personal lives. Murphy said that she did not have any children and that she thought her young nieces and nephews were "monsters."

Lucas had, and has, serious health problems. In March and April, 2003, Lucas had a kidney stone. After going to the hospital emergency room, Lucas went in to work the next day to continue her training in data processing. Murphy was concerned that Lucas had come in for training and, because Lucas appeared to be ill, Murphy directed that she be escorted off the premises.

In May 2003 and afterwards, Lucas suffered from a chronic illness that required repetitive medical treatment. Lucas told Murphy that the illness may be serious and, apparently concerned, Murphy said that "health is more important than any job." Lucas was concerned about being away from work and told Murphy so, both orally and in writing. Murphy frequently e-mailed Lucas to tell her not to worry about operations at the branch and to focus on getting well. Lucas used personal time off ("PTO") and flex time, as approved by Murphy, to achieve a work week of 40 hours.

Lucas also had several conversations with Murphy about pregnancy and children. During one such conversation, Murphy told Lucas that she was so opposed to having children that she made her husband submit to a vasectomy so that she could not become

-4-

pregnant. Lucas also had a conversation with Murphy in which Murphy told Lucas of the pregnancy, illness, and absence of Kelly Harrison ("Harrison"), a personal banker at the Franklin branch. Lucas gathered from Murphy that Murphy doubted the legitimacy of Harrison's illness, as she appeared irritated at having to find a temporary replacement. Finally, in the summer of 2003, Baker and Murphy hired a CSR named Kimberly for the Greenfield branch, and later learned that Kimberly was pregnant at the time she was hired. Murphy told Lucas that if she had known of Kimberly's condition before she was hired, "the outcome of her employment would have been different."

## III.    Performance Issues – 2003

Over the course of the late summer and early fall 2003, Murphy began to hear[1] of problems Greenfield branch staff were having with Lucas. The problems centered around Lucas' frequent unexplained disappearances from the branch and apparent lack of understanding of the operational aspects of banking.

Although Lucas did not share her work philosophy with Murphy, she began confiding in South Milwaukee BEO Denise Walkowiak ("Walkowiak") a few months after she began employment. In addition to asking general operational questions, Lucas discussed her work habits and personal matters, and would often tell Walkowiak that she was leaving the office early and coming in late. When asked how she could leave early, come in late, and still manage her branch, Lucas explained: "That is what you have a good assistant for." Lucas

---

[1] Lucas objects that this finding of fact is hearsay. The Court accepts this finding of fact because it is offered to prove its effect on Murphy's state of mind as the decision maker with respect to Lucas' continued employment. It is not offered to prove the truth of the matter asserted.

confessed that her husband agreed with her philosophy, which she stated as "Why would you put in more hours when you don't have to." Lucas repeatedly told Walkowiak that she worked only 20 hours per week, and that she kept this schedule from the summer of 2003 through the time she was transferred out of the BEO position. Lucas' attitude surprised and irritated Walkowiak because she worked double the amount of hours as Lucas in the same position.

Lucas told Murphy that she had been conversing with Walkowiak at the South Milwaukee branch. Murphy told Lucas to be careful when talking to Walkowiak because "she [Walkowiak] loves to gossip. Don't tell her anything you don't want to get around." Murphy still encouraged Lucas to use the other BEOs (including Walkowiak) as a resource to assist Lucas in learning more about the work of a BEO and the policies and procedures of the bank.

Beginning in August 2003, Murphy learned from senior staff members and others who were in the Greenfield office that CSRs were consulting them when in need of assistance with day-to-day bank operations. This was happening because Lucas could not be located or was not approachable or knowledgeable enough to be of assistance.

By October 2003, Branch Receptionist Nancy Jurena ("Jurena") reported that Lucas' failure to appear at the branch on a regular basis was becoming the subject of discussion among the CSRs, as was Lucas' lack of support for work-related issues, including questions relating to internal and external client matters.

Murphy learned that Lucas began calling Jurena at home in the fall of 2003 requesting that Jurena tell Lucas if the staff was talking about Lucas and what they were saying. Murphy also learned that Jurena was very uncomfortable being a spy for Lucas and was uncomfortable with Lucas calling her at home. Jurena reported that staff viewed Lucas as unapproachable and unfamiliar with basic operational duties such as teller-related duties.

Lucas was routinely closeted in her office and inaccessible to staff. Lucas' continued deficiencies in staff performance management, branch client services and internal client service were noted during her October 8, 2003 annual review.

Rather than improving on these areas, Lucas' ability to perform the operational responsibilities of her position continued to decline through the fall of 2003. Lucas became progressively more surly, withdrawn and unavailable to staff. Murphy saw a corresponding tension among staff. The CSRs were generally silent, and interactions were short and surly. Murphy observed staff walking on eggshells around Lucas and being short with customers.

## IV.    Health Issues – 2003 - 2004

In late October 2003, while working her shift at the Greenfield branch, Lucas experienced what appeared to be the symptoms of a stroke and Murphy took her to the emergency room at St. Luke's Hospital in Milwaukee. The physicians ruled-out a stroke and Lucas, though weakened from the rigorous testing, returned to work. The medications she was prescribed had negative side effects, partly because she has a genetic chemical sensitivity to most prescription and over-the -counter medications.

Case 2:05-cv-00888-RTR   Filed 04/16/07   Page 7 of 28   Document 107

In early November 2003, Lucas told Murphy that a brain scan had revealed some abnormalities and that she had to undergo further testing. Lucas asked Murphy to keep the information confidential until there were more conclusive results. Murphy said, "You know, news like this is the kiss of death in most employers' eyes."

In late November 2003, Lucas was asked by the Human Resources Department to complete a medical questionnaire. The reason given to Lucas for having to do so was that the bank was preparing to engage in a self-funded health insurance program. This was the second questionnaire Lucas completed in just eight months. Lucas identified all of the medical issues she faced or might be facing and returned the questionnaire to Human Resources. After returning the questionnaire, Lucas was given an authorization for release (to PyraMax) of medical information. Lucas learned from her physician that the reason for the authorization was that the bank was seeking a "stop loss" insurance policy to protect it in case the cost of any particular employee's health care exceeded a certain amount.

In mid-December 2003, Lucas told Murphy that she wanted to become pregnant again and that she needed to be away from the office for a short while to address her fertility problems with her OB-GYN. Murphy appeared to be surprised and said, "Why would you want another child? Won't you be high-risk?" She then immediately said, "Oh, I'm glad that I hired Rob Cooper." In December 2003, Murphy announced at a meeting of all of the bank's BEOs that the bank had hired Robert Cooper ("Cooper") as a "manager trainee."

Between December 19, 2003 and January 19, 2004, Lucas was away from work on personal and bereavement leave because of the deaths of her mother and, six days later, of

her grandmother. Shortly before going on leave, Lucas hired Jessica Overmyer ("Overmyer") as Assistant Manager.

Shortly after returning from bereavement leave, but while ill with acute bronchitis, Lucas attended a meeting of BEOs. Upon Lucas' arrival at the Greenfield branch, Murphy stopped her and angrily upbraided her in front of the Greenfield staff. Murphy appeared incensed that Lucas had come in and she directed Lucas to leave the premises before noon or she would give Lucas a written warning.

In mid-January 2004, Lucas applied for the position of Consumer Lending Manager at PyraMax. Lucas was not selected for the position because, as explained by Baker, the bank "wanted someone that was always going to be there – someone we can depend on." The bank hired Erik Halling ("Halling"), a male, to fill the position. Lucas discussed Baker's comment with Murphy, but Murphy told Lucas that she "did not have any issues with [Lucas'] attendance."

## V. Performance Issues – Spring 2004

In April 2004, Lucas took issue with something Halling did in relation to a lending campaign and loudly criticized Halling in full view of the Greenfield personal bankers. Murphy advised Lucas that it was unprofessional to have a confrontation with a senior staff member in front of her staff, and that it was clear to Murphy that the Greenfield branch was still not being operated as it should be.

Sometime in the Spring of 2004, other departments in the bank told Lucas that the CSRs did not smile enough when providing service to customers. Lucas met with staff and asked them to be more aware of facial expressions when servicing customers.

On May 6, 2004, because staff communication and morale had progressively worsened since October 2003, Murphy spoke to Lucas regarding a number of issues. Murphy told Lucas that she needed to work on operations and personnel management skills in order to bring her performance up to a satisfactory level. Murphy discussed her poor work attitude and the fact that it was very apparent when she was mad or upset. Murphy advised Lucas that staff in the branch picked up on Lucas' angry attitude and either avoided her or shared her negative attitude. Murphy reminded Lucas that she had problems controlling her temper when she was upset, acted out in an unprofessional manner in front of others and her staff, and failed to wait and ask questions or share concerns in private as would be expected from an individual in her position. Murphy discussed the Halling altercation with Lucas as an example.

Murphy also advised Lucas that her frequent unexcused absences from the Greenfield branch were noted. Murphy expressed concern about the amount of times Lucas continued to seek Murphy's attention, advice, and supervision relating to responsibilities that she should have accomplished independently. Additional concern was expressed over her frequent visits to Murphy's office simply to chat. Murphy advised Lucas that she routinely required more of Murphy's time each week than all other BEOs combined.

-10-

Murphy told Lucas that she had strength in selling bank products and services, but still lacked the basic skills required to ensure operation of a bank branch. Murphy advised Lucas that many of her staff members and senior staff were very complimentary about the performance of Cooper, who acted as BEO at the Greenfield branch during one of Lucas' extended absences. Murphy advised Lucas that Cooper's attitude was good and he alleviated an atmosphere of fear and tension in the Greenfield branch which Murphy viewed as being created under Lucas' supervision.

After the discussion and as Murphy stood up to leave Lucas' office, Lucas threw a paperclip across her desk and stated, "Nothing like being blindsided." While Lucas was in tears at the end of the conversation, Murphy was momentarily shocked at Lucas' aggressive and angry demeanor and extreme hostility which she felt was completely inappropriate in any professional setting. Murphy advised Lucas that her fits of anger were unacceptable in the workplace.

## VI.    Transfer to BEO - Floater/Trainee

Sakhone Phakphoom ("Phakphoom"), a CSR at the Greenfield branch, resigned on June 7, 2004. On June 17, Phakphoom advised Murphy that she had complaints about Lucas and assistant BEO Jessica Overmyer. Phakphoom felt that she was treated harshly and that Overmyer had become withdrawn and unpredictable. Phakphoom confided that Lucas did not have a good working knowledge of the operations of the branch and that this was a problem because the staff did not have anyone to go to if they had a question about something. Phakphoom also confirmed that Lucas was gone a lot of the time, leaving the

staff alone. Phakphoom advised that she could no longer work in the environment of the Greenfield branch even though she did not have alternate employment lined up. She complained that she was told to smile when corporate employees were in the branch. Phakphoom stated that she liked it when Cooper filled-in for Lucas, because Cooper was available for questions, was patient and very positive.

Murphy also spoke with Greenfield CSRs Ashley Weller ("Weller") and Shannon Meza ("Meza"), who were also seeking other positions because of management problems in the Greenfield branch. Both stated that they had problems with Overmyer, and that Lucas had instructed them to smile when corporate employees were in the branch. Weller advised that she had stopped sharing any concerns with Lucas because even when she did, nothing was done. Weller also advised that the CSRs never went to Lucas for information on anything because Lucas did not understand operations or transactions and would not have an answer. Instead, Weller would consult with Overmyer or when Overmyer was off work, would call other locations, departments, or even call Overmyer at home with questions or problems relating to bank operations.

Because three CSRs were on the verge of leaving the Greenfield branch, Murphy met with Overmyer to discuss the management and direction of that branch. Murphy asked Overmyer what she thought the problem was and why her focus and attitude had changed so drastically from the time she worked at the Franklin branch, where she did not have a single problem or complaint from a staff member. Overmyer was extremely distressed and advised that she felt overwhelmed by the amount of work that was required of her.

-12-

Overmyer confessed that she had been handling all client issues, all operational issues and most managerial issues, so was effectively doing both her job and Lucas' job since she assumed her position as Assistant BEO. Overmyer advised that she was upset that Lucas was unable to back Overmyer up because Lucas did not understand or show interest in operational skills. Overmyer indicated that she was struggling because she was not getting the support she needed from Lucas. Overmyer also advised that Lucas was frequently out of the office and that Overmyer was often unaware of Lucas' schedule and left alone unexpectedly. Overmyer advised that Lucas did not spend time out in the lobby or with Overmyer even when she was in the branch, but spent her time in her office on the phone or with the personal bankers. Overmyer advised that she had stopped talking to Lucas about her concerns because nothing would change and that Lucas was not rational and constantly complained.

When Murphy asked Overmyer what Murphy could do to help her with the situation, Overmyer asked to be relocated to the Franklin branch so she could work with her former BEO. By this time, based upon Murphy's conversations with Overmyer, Phakphoom, Weller and Meza, Murphy's experience with Overmyer's excellent work performance before she came to the Greenfield branch, and Murphy's observations of Lucas' work performance, Murphy concluded that Lucas' behavior was the root cause of what appeared to be an impending mass exodus of employees from the Greenfield branch. Lucas was unfamiliar with the most basic of operational skills, could not assist or supervise her staff, abandoned the bulk of her duties as BEO and required Overmyer to assume responsibility for Lucas'

-13-

duties as well as her own. Murphy concluded that Overmyer had developed problems with her management skills because she was forced to perform both her job and Lucas' job.

After Overmyer asked to be transferred back to the Franklin branch, Murphy advised Overmyer that it was impossible to do this. Murphy asked Overmyer how she would feel if Lucas was not working at the Greenfield branch. Overmyer advised that she would be relieved and have a better attitude. Overmyer stated that she needed a better partner in managing the Greenfield branch.

Murphy and Baker discussed Overmyer's operational skills, management skills and interpersonal skills and noted that while Overmyer was at the Franklin branch, there were no issues or complaints from staff and Overmyer's attitude was positive and focused. Murphy then advised Baker that Overmyer was upset, agitated and angry at Lucas, and apparently felt unsupported and alone. Murphy told Baker that she felt Overmyer did not cause the issues at the Greenfield branch but that she was a victim and found herself without a management partner because Lucas was not performing her job.

Murphy and Baker also discussed Cooper's positive impact on the branch and Lucas' poor attitude and lack of operational skills, which was causing serious problems in the Greenfield branch. Murphy felt that doing nothing was inappropriate and would cause the employee exodus Murphy had learned about. Murphy advised that Lucas should be taken out of the Greenfield branch to prevent loss of staff because of Lucas' work deficiencies.

While Baker was in favor of termination, Murphy noted that Lucas was still an asset because she demonstrated good sales skills. They ultimately decided that Lucas would be

-14-

transferred from her position at Greenfield to a floating BEO trainee position with the same salary and benefits. Lucas would undergo training to address her deficiencies in operational skills, with the ultimate goal of acting as a floating BEO once her performance deficiencies were addressed.

The same day, Baker and Murphy met with Lucas to inform her of their decision. Lucas stated that complaints about her performance were related to the "mixed signals" she had received from Murphy. Baker advised Lucas that the only reason she was being offered the lateral transfer was because Murphy found some value in some of her contributions and that if she did not take the lateral transfer she could resign.

On the day she was demoted (June 18, 2004), Lucas called Walkowiak from home sometime after 3:00 in the afternoon. Lucas was very upset and told Walkowiak about the general terms of her demotion and about her suspicions regarding the role played by Murphy. Walkowiak agreed with Lucas that Lucas' medical problems and the hiring of Robert Cooper were – or should have been – "red flags."

At no time before or during the decision to transfer Lucas to a lateral position did Murphy take into consideration her family status or the possibility that she may have been or intended someday to become pregnant. Murphy does not recall Lucas ever mentioning her intention to become pregnant, and if she did so, it would not have been an extraordinary statement. At the time of Lucas' transfer, the majority of Murphy's BEOs were female.

-15-

On June 18, 2004, the Greenfield BEO position was posted internally. On June 21, 2004, Cooper assumed Lucas' duties in his role as floating BEO. On the same day, Phakphoom rescinded her resignation.

Cooper had been hired in 2003 because he had 15 years of experience as a BEO, and had been trained by Walkowiak. Cooper was viewed so favorably by senior staff that when he submitted his resignation on June 14, 2004, before Baker learned of the impending staff exodus at the Greenfield branch, Baker persuaded him to stay by authorizing a pay increase. Cooper applied for the Greenfield BEO position on June 21, 2004; he was the only individual who responded to the internal posting. Cooper was interviewed for the position on June 23, and was offered the position.

## VII. Lucas' Training, Continued Health Problems

Rather than resigning, Lucas accepted the floating BEO-trainee position, in part because she needed health-care benefits for her family and for herself. She continued to receive the same salary and benefits, including an incentive payment given to her on July 23, 2004. She was not eligible for incentive payments thereafter. Lucas was placed on a "trainee program" after June 21, 2004, but was stripped of all loan authority, removed from the bank's internal telephone directory, and deprived of a telephone, desk, and office. When Lucas attempted to send an email to Murphy from home – something that she had always been able to do – she found that she could no longer access the bank's computer and e-mail system.

-16-

Lucas began her training at the Milwaukee branch on June 21, 2004. As part of her training, Lucas was asked to train new personal banker Irene Rosado. Lucas was so surly and uncommunicative that Rosado broke down and began to cry.

Lucas was on leave between June 22 and August 15, 2004 because the events surrounding her demotion/transfer exacerbated an anxiety and panic disorder from which she suffered. While she was on leave, Lucas filed a discrimination complaint with the Wisconsin Equal Rights Division in July 2004. Murphy did not tell any of the BEOs that Lucas had filed a discrimination complaint.

Lucas continued her training when she returned in August 2004. During her training, Lucas was instructed to perform some basic maintenance work such as dusting walls and baseboards while assigned to the South Milwaukee branch. Her comings and goings were subjected to a higher level of scrutiny, and her e-mails, breaks, and absences were monitored and documented.

Lucas trained in the Data Processing Department under Denise Merkel ("Merkel"). While training there, Lucas suffered from a medical disability that caused severe dizziness and imbalance while at work. She experienced sensory conflict with her eyes, ears, brain, and vestibular systems, and was unable to follow text on a computer screen, engage in rapid eye movement, and had difficulty reading printed pages and viewing training videos.

In early October 2004, Lucas was diagnosed with a genetic sensory conflict condition. According to her physician, Lucas was to avoid activities that would exacerbate her

Case 2:05-cv-00888-RTR   Filed 04/16/07   Page 17 of 28   Document 107

condition, such as any activity requiring rapid eye movement (like scrolling a computer screen) or activities requiring rapid repetitive hand-eye movement.

In November, 2004, the Data Processing Department was in need of a floater to temporarily fill a Data Processing Specialist position during the planned medical leave of the person holding that position. Baker, Murphy, and Assistant Vice President-Data & Financial Services Denise Merkel discussed the possibility of hiring Lucas for the position. Merkel declined to hire Lucas for the position, based in part on Lucas' poor attitude and failure to master basic data processing tasks.

## VIII. Lucas' Termination

By early December 2004, Murphy learned that Lucas was not improving her skills as expected during her training as floating BEO. On December 8, 2004, Walkowiak reported that during the twelve weeks Lucas was assigned for training at the South Milwaukee branch, staff reported that Lucas was scrutinizing them and causing unnecessary tension in the office. The majority of the South Milwaukee staff indicated that they could not wait until Lucas was gone. Walkowiak reported that she would not feel comfortable leaving Lucas alone with branch staff members for any length of time, in part because Lucas consistently exhibited a negative attitude and spoke negatively about the branch and South Milwaukee branch employees.

Lucas seemed to want to be treated with a great deal of respect, resented her role as a trainee and complained that she was not treated with enough respect by staff. By the second week of her training, the morale at the South Milwaukee branch had already been

-18-

damaged by Lucas' negative remarks made about staff. Walkowiak reported that Lucas did not have the knowledge or skills to be a BEO, and that her operational level was far below that of an average teller. Walkowiak advised Murphy that it would not be in the best interests of PyraMax Bank to send Lucas to any other branch location because it would produce the same negative, tense and unproductive situations. Walkowiak's opinion was substantiated by others who had worked with Lucas.

Accordingly, Murphy was forced to abandon her earlier hope that Lucas could be an asset to PyraMax with training. Murphy had been forced to remove Lucas from two of the seven branches of PyraMax due to her conduct and performance. Walkowiak reported that Lucas was unfit to act as a floating BEO in any of the branches. Murphy trusted Walkowiak's evaluation. Based upon the inability to place Lucas in any available position because of her work deficiencies, Murphy had no option but to terminate her, and did so on December 10, 2004.

Prior to her termination, Lucas voluntarily withdrew from PyraMax's health, dental and vision plan effective December 1, 2004. Lucas was not pregnant during her tenure with PyraMax, and never told Murphy or anyone else that she was pregnant.

In 2004, Lucas' medical claims totaled $57,731.12, or 192.43% of $30,000.00, the amount above which the bank had stop-loss insurance coverage. The amount of Lucas' claims in 2004 was the highest of any employee and second only to the spouse of an employee.

-19-

# ANALYSIS

Under Rule 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The "plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

## I.      Gender Discrimination

Lucas alleges that she was demoted and terminated because of her gender. Lucas has no direct evidence of discrimination. *See Rogers v. City of Chicago*, 320 F.3d 748, 753 (7th Cir. 2003) (citing *Walker v. Glickman*, 241 F.3d 884, 888 (7th Cir. 2001)) (Direct evidence of discrimination is evidence that, "if believed by the trier of fact would prove [discrimination] 'without reliance on inference or presumption'"). Instead, Lucas relies on circumstantial evidence. Circumstantial evidence can be used to "infer intentional discrimination by the decision-maker." *Rogers*, 320 F.3d at 753. The most common type of such evidence consists of "suspicious timing, ambiguous statements oral or written, behavior toward or comments directed at other employees in the protected group, and other bits and pieces from which an inference of discriminatory intent might be drawn." *Troupe v. May Dep't Stores Co.*, 20 F.3d 734, 736 (7th Cir. 1994). Taken separately or in

-20-

combination, circumstantial evidence can compose a "convincing mosaic of discrimination against the plaintiff." *Id.* at 737.

Lucas attempts to raise suspicion by noting that her male replacement (Cooper) was far worse at selling bank products than she was. Lucas further argues that the bank was doing everything it could to give Cooper Lucas' job, authorizing a pay raise to keep him when Cooper resigned *before* Lucas was demoted in June 2004. Lucas also notes that a male (Eric Halling) who was less qualified than her was hired for the Consumer Lending Manager position instead of Lucas. Finally, Lucas argues that Carlos Fernandez ("Fernandez"), a male BEO at a different branch, was treated more favorably than Lucas when he was forced to resign for more serious misconduct involving fraudulent loan activity.[2]

This evidence does not create a convincing mosaic of discrimination. First, Lucas does not provide enough evidence to suggest that Fernandez was similarly situated to Lucas at the time of his resignation. Second, Halling was hired over Lucas because he did not have Lucas' health and attendance issues. Third, Cooper was the favored replacement because he worked well with the Franklin branch employees, not because of his gender. There is nothing to suggest that Cooper's gender was the deciding factor. *See, e.g., Blise v. Antaramian*, 409 F.3d 861, 866 (7th Cir. 2005) (circumstantial evidence must point "directly to a discriminatory reason for the employer's action"); *Cerutti v. BASF Corp.*, 349 F.3d 1055, 1063 (7th Cir. 2003) (statements regarding plaintiff's age did not form a convincing

---

[2] Fernandez was BEO at the Milwaukee branch and was forced to resign on February 10, 2004. (Plaintiff's Proposed Findings of Fact, ¶ 271).

-21-

mosaic of circumstantial evidence where prejudicial views were not clearly linked to termination decision).

Lucas' claim also fails under the indirect "burden-shifting" method. To state a *prima facie* case of gender discrimination, Lucas must produce evidence that (1) she is a member of a protected class, (2) she was meeting her employer's legitimate business expectations, (3) she suffered an adverse employment action, and (4) her employer treated similarly situated employees outside of the class more favorably. *See Ballance v. City of Springfield*, 424 F.3d 614, 617 (7th Cir. 2005).

The undisputed evidence demonstrates that Lucas was not meeting PyraMax's legitimate expectations for her job performance. Specifically, Lucas failed to grasp the basic operational duties required to run a PyraMax branch. Moreover, it was apparent to Murphy that Lucas had difficulty managing the personalities at the Greenfield branch and consistently displayed a bad attitude, especially during her training for the floating BEO position.

Lucas focuses on her undisputed ability to sell bank products, because she made the Greenfield branch the most successful PyraMax branch in terms of consumer loans. Clearly, sales was an important part of the job, but not the *only* important aspect of being a successful BEO at PyraMax. Murphy herself recognized Lucas' sales contributions when she initially convinced Baker to keep her at PyraMax in a different position. However, PyraMax's expectations for Lucas as a BEO (or floating BEO) extended beyond the ability to sell bank products, which was ultimately Lucas' downfall. It is not for the Court to second-guess PyraMax's decision that Lucas' strengths (sales) were outweighed by her weaknesses

-22-

(operations, interpersonal, management). *See Millbrook v. IBP, Inc.*, 280 F.3d 1169, 1176 (7th Cir. 2002) (Court's role is not to "act as a 'super personnel department' that second-guesses employers' business judgments").

Even if Lucas was meeting PyraMax's performance expectations, she fails to provide any similarly situated employees who were treated more favorably. As stated above, Lucas fails to provide enough evidence to create an issue of fact that Fernandez was similarly situated to Lucas in any respect. *See, e.g., Ajayi v. Aramark Bus. Servs., Inc.*, 336 F.3d 520, 532 (7th Cir. 2003) (factors used to determine whether employee is "similarly situated" include whether the employees (1) held the same job description, (2) were subject to the same standards, (3) were subordinate to the same supervisor, and (4) had comparable experience, education, and other qualifications).[3]

## II.   Retaliation

To state a retaliation claim under the "direct method,"[4] Lucas must produce evidence of: (1) a statutorily protected activity; (2) an adverse action; and (3) a causal connection between the two. *See Haywood v. Lucent Techs.*, 323 F.3d 524, 531 (7th Cir. 2003). While the discriminatory acts proscribed by Title VII's anti-retaliation provision "are not limited to those that affect the terms and conditions of one's employment . . . . the employer's

---

[3] Even if Fernandez could be considered "similarly situated," Fernandez was not treated more favorably than Lucas. Both ended up losing their jobs. Moreover, Lucas cannot argue that she hoped for the treatment that Fernandez received. Lucas alleges that her demotion and *termination* were discriminatory in violation of Title VII, not the fact that PyraMax did not allow her to resign or that PyraMax contested her application for unemployment benefits.

[4] The direct method is Lucas' only recourse because she "cannot prove that a similarly situated employee who did oppose the employee's practice was not fired or otherwise treated as badly as the plaintiff was." *Sylvester v. SOS Children's Villages Ill. Inc.*, 453 F.3d 900, 902 (7th Cir. 2006).

-23-

challenged action must be one that a reasonable employee would find to be materially adverse such that the employee would be dissuaded from engaging in protected activity." *Roney v. Illinois Dept. of Transp.*, 474 F.3d 455, 461 (7th Cir. 2007) (citing *Burlington N. & Santa Fe Ry. Co. v. White*, — U.S. —, 126 S.Ct. 2405, 2412-13, 2415 (2006)).

Lucas argues that she was retaliated against for filing an ERD complaint in July 2004. As evidence, Lucas provides the deposition testimony of John Dorr ("Dorr"), PyraMax's controller and head of the Accounting Department. Dorr stated that Lucas was assigned to train in the Accounting Department because he had been told by Murphy that "there was a lawsuit" or "there was a good chance there was going to be a lawsuit." (Plaintiff's Proposed Findings of Fact, ¶ 382). However, Lucas' training assignment in Accounting, standing alone, is not a materially adverse action. *See Schobert v. Illinois Dep't of Transp.*, 304 F.3d 725, 731 (7th Cir. 2002); *Herrnreiter v. Chicago Housing Auth.*, 315 F.3d 742, 745-46 (7th Cir. 2002) (to state an actionable claim of retaliation, the employee must complain of some action on the employer's part that causes her to suffer real harm).

More specifically, Lucas argues that her training schedule in Accounting (and elsewhere) was highly detailed, she was given humiliating menial tasks, her comings and goings were carefully monitored, and that she was never told how long her training was going to last. However, the overarching decision to have Lucas submit to training was made in June 2004, *before* she filed her ERD complaint

Moreover, the concept of an adverse retaliatory action contains an element of objective reasonableness. *See Roney*, 474 F.3d at 461. While Lucas might have disliked

cleaning and an increased level of scrutiny, a reasonable employee would not have been dissuaded from pursuing a discrimination complaint under such circumstances. Title VII is not a general civility code for the American workplace, and an employee's decision to report discriminatory behavior "cannot immunize that employee from those petty slights or minor annoyances that often take place at work and that all employees experience." *Burlington N.*, — U.S. —, 126 S. Ct. at 2415. Lucas' humiliation is purely subjective and she cannot state an actionable retaliation claim on this basis alone.

Finally, even assuming that the circumstances of Lucas' training in Accounting (and elsewhere) were materially adverse, there is nothing to suggest that Lucas was subjected to those circumstances because she filed an ERD complaint. And as noted above, the decision to train Lucas was made prior to her ERD filing.

## III.   ERISA

Section 510 of ERISA makes it "unlawful for any person to discharge, fine, suspend, expel, discipline, or discriminate against a participant or beneficiary for exercising any right to which he is entitled under the provisions of an employee benefit plan . . ." 29 U.S.C. § 1140. Lucas argues that she was terminated because of the amount of money PyraMax was paying for Lucas' claims under its health insurance plan and to avoid paying such claims in the future.

It is undisputed that effective December 1, 2004, Lucas voluntarily withdrew from PyraMax's health plan, and she was terminated a week later on December 8. Accordingly, PyraMax argues that Lucas cannot state an ERISA claim as a matter of law because "ERISA

-25-

protects only employees who are 'participants' and 'beneficiaries' of ERISA-governed plans." *Bilow v. Much Shelist Freed Denenberg Ament & Rubenstein, P.C.*, 277 F.3d 882, 892 (7th Cir. 2001). However, a participant under ERISA is actually defined as "any employee . . . of an employer . . . who is or *may become* eligible to receive a benefit of any type from an employee benefit plan." 29 U.S.C. § 1002(7) (emphasis added). While Lucas withdrew from the plan, Lucas was apparently eligible to re-enroll if she decided to in the future.

As circumstantial evidence, Lucas notes that concerns over her unsatisfactory performance were manufactured starting in May 2004 in response to Lucas' escalating health care costs. However, the evidence is overwhelming that Lucas's failure to learn operations and to effectively manage her branch led to the decision demote and ultimately terminate her employment. PyraMax's general concern about the costs associated with Lucas' health care costs, and its corresponding efforts to curb those costs by instituting a stop-loss insurance policy, is not enough to suggest that Lucas was demoted and terminated as a result thereof. In fact, the effort to institute a stop-loss began as early as November 2003, and Lucas wasn't demoted until seven months later in June 2004 when her performance problems came to a head.

Lucas suggests that Baker's negative attitude towards Lucas' work performance was related to her authority to review medical claims at PyraMax. There is nothing to suggest that Baker's negative perception of Lucas' job performance was a result of her medical claims.

## IV. FMLA

Lucas alleges that she was terminated for exercising her rights under the FMLA. There is no evidence to suggest that Lucas' exercise of her FMLA rights was a factor in the decision to demote and ultimately terminate her employment. The simple fact that Lucas had failed to exhaust a period of intermittent FMLA leave when she was terminated does not suggest a causal link between the two. Employers may "fire employees for poor performance if they would have fired them for their performance regardless of their having [requested] leave." *Ogborn v. United Food and Commercial Workers Union*, 305 F.3d 763, 768 (7th Cir. 2002).

Lucas argues that an issue of fact exists because PyraMax knew of Lucas' performance problems prior to her intermittent leave in November-December 2004. The performance problems that occurred during that time period also factored into the decision to terminate Lucas' employment.

**NOW, THEREFORE, BASED ON THE FOREGOING, IT IS HEREBY ORDERED THAT**:

1.  PyraMax's motion for summary judgment [Docket Nos. 65, 67] is **GRANTED**; and

2.  This matter is **DISMISSED** in its entirety.

Dated at Milwaukee, Wisconsin, this 16th day of April, 2007.

**SO ORDERED,**

<u>s/ Rudolph T. Randa</u>
**HON. RUDOLPH T. RANDA**
**Chief Judge**
